Good morning, Your Honors. It may have pleased the Court. My name is Mike Hazard, and I'm here with my co-counsel, Rossi Buntrock, and we represent the petitioner, Fones4All Corporation. And I would like, if I may, reserve three minutes for rebuttal. You'd have to help keep track of your own time, because that's the full time. Yes, Your Honor. There are at least two casualties in this case. One is my client, Fones4All, who in August filed for bankruptcy protection. And the second is Congress, which legislated in Section 160 a petition-driven process with strict deadlines and a deemed-granted self-executing remedy. And when I was preparing for this case and actually speaking with my wife about it, I was kind of going through all the various iterations of things. And she said, wait a minute. Now, there's a deadline, and the FCC was still working on this case after the deadline passed. Isn't that right? And I said, yes. She goes, well, in my whole life, in every experience I've had, if I'm still working on something after the deadline passed, then I missed the deadline. And that's exactly what happened here. The FCC missed the deadline, and Congress established the consequences, which is that the Fones4All petition was deemed-granted by operation of the statute. Now, the FCC can't take away that which Congress provided. And accordingly, we request that this Court enforce the congressional remedy, find that Fones4All was deemed – Fones4All's petition was deemed-granted, and vacate the admittedly untimely FCC order. Any other result would be contrary to Congress's directive and reward the FCC for operating outside the bounds of its congressional authority. Do you think that position is consistent with the position of the D.C. Circuit in this regard? I think it's exactly consistent with the D.C. Circuit's recent case in Sprint and Excel v. FCC, where effectively the majority opinion said where all we have before us at the expiration of the statutory deadline is a vote, all we can do is look at the vote, and a vote can't stop the deemed-granted remedy by Congress from operating. Just as your Honors will do sometime later today, you'll convene at a conference and you will vote on the way you believe this case should be decided. In that case, had that position been asserted before the FCC? Had there been – had they asked the FCC to rule on that position that was already – that it was untimely and had been deemed-granted? Had who asked the – The petitioner. The petitioner at Sprint and Excel in that case sought review of the – an FCC press release announcing the FCC's decision and also attempted to treat the separate statements of two other Commissioners as effectively orders. But what the – what the Court said there was, you know, look, we review orders. We don't review votes. We don't review press releases. But the key point in Sprint and Excel is that once that remedy operates, the Commission can do no more. The Commission's job in that petition is done, and Congress acts through the power of the – the congressional remedy supplied. And just think from a district court perspective that here I am, counsel, I send an email to the clerk's office saying, today's the last day of my statutory deadline. I have completed my complaint, and I will file it with you as soon as possible. If I file it the next day, I'm not going to be – I'm not going to find a very sympathetic group of folks. They're going to say, well, you had so much time. You waited until the end. Well, you know, this Court has on occasion filed an order saying the decision of the – because we are under a time pressure and the parties need an answer. So we will say the decision, the judgment of the district court is reversed, and opinion explaining the reasons for this decision will follow. But the reversal is effective when the order reversing comes down. So isn't that roughly analogous? It sounds roughly analogous, Your Honor, except you don't have a congressional directive that says that you must resolve petitions within one year, and that you may, if you find necessary to meet the requirements of the normative standard set forth, give yourself a one-time deadline of 90 days. And if you don't complete your work by then, we're going to take over and dean grant the remedy requested. So Congress, again, sets forth – the standard default is 12 months, which unfortunately the agency has converted into a 15-month process. So Congress said, look, we want you to get these petitions taken care of in one year. We want you to issue something in writing, something from which people will know what their rights are, will be able to have appellate review of. And they've taken that and they've added three months onto it. And, you know, again, there can be no question that they – not only did they miss the deadline, but they knew it applied. And how do we know that? Because they backdated the order. If it was just fine to go ahead and say, well, we can, you know, we voted. We can just issue an order whenever. What's the point of backdating it? But that's what they did. Hey, my complaint's done. I'm going to file it late, but just, you know, treat it as if I filed it on that date. Okay. Let me ask you a question on a different subject. You referred to the sad situation of your client. Yes, Your Honor. Is there a question here of mootness? Your Honor, there's no question here of mootness. Phones for All is currently going through the bankruptcy process. And in that process, there are a number of claims and counterclaims, all of which I'm not specifically familiar with. But interveners AT&T and Verizon have claims against Phones for All, which would be offset by overcharges from AT&T and Verizon. And I may not have explained that all that well, so let me step back. Phones for All had these contracts with AT&T and Verizon that are known as interconnection agreements. And these contracts enabled Phones for All to purchase a wholesale service offering known as UniPay. And UniPay was available for a number of years, and it's a very low wholesale rate for providing service. In this case, Phones for All was using it to provide lifeline service to consumers in California. After the FCC's rule took effect, the rule that says folks like Verizon and AT&T no longer have to provide UniPay, after their contracts were abrogated by that rule, AT&T and Verizon began providing an essentially analogous service. The only difference between the service offering they were getting before and the service offering they were getting after the FCC's rules, to my knowledge, was the price. And so they started getting these substantially larger bills for the same service. And so if we're right and it was deemed granted and the forbearance operated to preserve Phones for All's contract, at least for that small class of customers, these single line residential customers that qualify for the lifeline subsidies, then Phones for All was overcharged for a couple of years. And then those overcharges could be offset against any monies that AT&T and Verizon currently claim Phones for All owes. So you're going to survive the bankruptcy? I don't know whether Phones for All will survive bankruptcy or be liquidated as a result of the bankruptcy, but it will go through the process, and the value of the asset, Phones for All, is what it is. And that value will be changed or could be changed as an outcome of this process. As an outcome of this process. And so if the court were to find that the Phones for All's position was deemed granted, but the contracts nonetheless were modified, then Phones for All would have a claim in that bankruptcy process. Okay. Now, I understand the sentiment that there is a level of technicality here. There's no question about it. But again, it's a deadline with a congressional remedy. Your position, or you concede that the order was done in a timely manner, don't you? But just the, I mean, excuse me, the decision, but the order wasn't timely. Because the decision came on the 90th day. The vote, I believe. All we know is there's a one-page press release that says today the FCC voted to deny Phones for All's petition. Or maybe it said voted to adopt an order to deny the petition. But in that one-page press release, which is a non-binding document, I think the FCC will, I think does concede that. I think that they rely on the vote, that the fact that the vote occurred was enough. But there's no discussion of the 10A factors. I mean, 10A sets out a series of normative factors that need to be considered and discussed in a writing to deny the petition. The competitive effects of the decision need to be raised or reviewed under Section 160B. But none of that happened, and there's no indication of what that was in the press release. And so here we are with they missed the deadline. We know that. Now, had they missed it by 30 days, would that be enough? Well, they didn't give an explanation, but why didn't you go to them and say, why don't you, this is not effective, because you missed the deadline, and ask them to reconsider that order because they missed the deadline, so thereby exhausting your remedies and maybe fixing the whole thing. So we would have to review. Well, a couple of reasons, Your Honor. One is that we filed an application for review of the underlying bureau decision extending the deadline, because bureau orders of the FCC are not reviewable, but you can seek review by the full commission through the application review process. And there we requested that the FCC do two things. First, we said, you know, please go ahead and correct this error and issue your own order if you want to extend the deadline. And as part of that, describe the factors. Describe why a deadline is necessary. Because under the statute, you don't just extend the deadline because it's expedient to do so. It's not because the FCC would like more time. It's because more time is needed to evaluate the normative factors that Congress set forth in Section 10 of 160A. And then the other thing we asked them to do was, given that the pressure we were under is we said, please release an order resolving the case. And they just didn't do it. And then I'll also note that there are two other cases in which a similar issue has come up. And the D.C. Circuit did not get to the merits of either of those cases. And 405 was the bar. But the case law in this court is that once the agency's position is known and not to be changed, the recognized futilities exception comes in and there's no requirement to seek reconsideration. All right. You're going through your time very rapidly. Yes. Would you like to address the merits quickly? Why isn't the original review remand order the thing that's really the problem here? And why isn't the agency correct that you can't get the relief that you want from this? Well, again, if you look at the text, what forbearance does is you ask the FCC to refrain from enforcing a specific provision. Right. We named the specific provision that we wanted them to refrain from enforcing. It's Rule 51.319. And, again, as one commenter said, you know, forbearance is an eraser, not a pencil. But if you read the text of 51.319, it empowered, again, companies like AT&T and Verizon to take away that which we had. Right. And so forbearing from their right to no longer give us the service offering would enable us to continue getting the service offering pursuant to our contracts. And so I think that the FCC's notion that our petition was procedurally defective is just incorrect. What they did was they took our request to perform a Section 10 analysis and said, Oh, what you really want to do is seek reconsideration of this other provision, Section 251C3, unbundling, and what you really want is an impairment analysis. Isn't what you really want the access? Fundamentally, what we want is to avail ourselves of our contracts. And there are various procedural vehicles for that result. One vehicle was the forbearance process. There may have been many other vehicles. In fact, Phones for All during the proceeding also sought a waiver. If we had thought there was another process we could have done that might have been effective, I believe Phones for All would have followed it. But I don't see anything in Section 160, which, again, is set up so the petitioner, telecommunications carriers, like Phones for All, can have the FCC forbear from enforcing its rules. It doesn't allow the FCC to recharacterize our petition as something that it's not. Okay. You've used your time. Are there any questions at this time? Thank you. Thank you. We'll give you two minutes for rebuttal. Good morning, Your Honors. May it please the Court. My name is James Carr. I represent the Federal Communications Commission. I'd like to begin by pointing out why it is that Phones for All cannot possibly obtain relief under the forbearance statute, even if there were a deemed grant in this case. If you take a look at the rule from which they want the FCC to forbear, it's on page A24 of the appendix of the petitioner's brief, 47 CFR section 51.319D. You have to go to D2, which talks about DSO capacity or mass market determination. It's a very complicated way of basically saying these are switches that are used to provide telephone service to residential An incumbent LEC is not required to provide access to local circuit switching on an unbundled basis to requesting telecommunications carriers for the purpose of serving end-user customers using DSO capacity loops. Okay. That provision, if the FCC were to forbear from that provision, it would simply eliminate a rule that says that the carriers are not required to provide these particular unbundled elements. It does not reinstitute the requirement that previously existed. To do that, as the Supreme Court and the D.C. Circuit have made clear, the FCC must take the affirmative step of finding actual impairment or some sort of justification. So there's nothing gained by forbearing from that. But if they're not required, they nevertheless could contract to do it, couldn't they? They could contract to do it independently, but that's not what Phones for All's contracts say. And Phones for All and the incumbent carriers are perfectly free to make their own arrangements. The contracts, as you become clear when you review them, the contracts are all based on the premise that there is a Federal requirement for unbundled switching and that Phones for All can then invoke its rights under the contract based on that Federal requirement. Once that requirement goes away, the incumbents are within their rights under the contract to discontinue providing that network element. So there would be no contractual rights for Phones for All to invoke. The second provision, little 2, talks about each requesting telecommunications carrier shall migrate its embedded base of end-user customers off of the unbundled local circuit switching element to an alternative arrangement within 12 months of the effective date of the Triennial Review remand order. That date was March 11, 2006. That was the deadline. The only relief Phones for All could possibly get from a victory here, the soonest it could get a deemed grant, would be on July 1st of 2006. That would be almost four months after this deadline had passed. Now, the FCC obviously can't forbear from enforcing a deadline that has already passed. So once again, there's nothing to forbear from here. Phones for All simply doesn't get any relief. That's why the FCC was entirely correct when it dismissed this petition as procedurally defective. Well, why did it take the FCC so long to do that if it's such a foregone conclusion? It's a fair question, Your Honor. I think the reason is that this really was the first forbearance petition where a carrier actually asked the commission to forbear from a rule that eliminated requirements. And the commission hadn't come up, hadn't focused on this issue before. And as a result, it took a while for the commission to decide the matter. At the same time, there was a lot going on in the area in terms of the shakeout regarding the unbundled elements litigation that had been going on for almost a decade at that point. What kind of track record does the FCC have in meeting these obligations? Well, by meeting these obligations... The time limits in this case. The commission has, in some cases, the commission acts within the one-year period. It does not need the 90-day extension. In other cases, it does need the 90-day extension. It has always, I shouldn't say it has always, it has usually acted, and by acted, I mean held a vote, either granting or denying the petition within the statutory deadline. The Sprint-Nextel case, to which Mr. Hazard referred, was a situation where a deemed grant occurred. That occurred because at the time, the FCC had only four sitting commissioners. One of the commissioners' terms had expired. The President had not been able to name a successor, so there were four commissioners Republicans and Democrats, and how much trouble that can cause sometimes. And as a result, there was a 2-2 split vote. And contrary to what Mr. Hazard said, that was the Court didn't find that that was a vote was insufficient. It found that that vote was insufficient because it really wasn't a majority vote. What does the statute require to be done? What is the precise language within that year subject to the limited extension? That's a good question, Your Honor. If you go to 47 U.S.C. section 160C, which is on A14 of the Petitioner's Brief, the sentence dealing with deemed grant says, Any such petition shall be deemed granted. That's the second sentence of the provision. Any such petition shall be deemed granted if the commission does not deny the petition for failure to meet the requirements for forbearance under subsection A of this section within one year after the commission receives it, unless the one-year period is extended by the commission. Now, there is a separate sentence. Kagan. Where are you reading again? I am reading from subsection C of 47 U.S.C. section 160. Okay. It's the second sentence there. If you look at the last sentence of section C, that is the only sentence that refers to explaining the decision in writing, issuing a written order. The last sentence says, The commission may grant or deny a petition, whole or in part, and shall explain its decision in writing. There is nothing in the statute that clearly indicates that the commission must issue a written decision within the time frame. All it says is that the commission must deny. And under the statute, does the commission have an unlimited time in which to explain the reasons for its ruling? Because there are limitations on when you can seek review. Right. Well, the time for seeking review does not begin until the FCC issues the written order. And that's a difference that is the explanation. So that wouldn't affect the timing of seeking the written review. Well, is that consistent with your position that they can just announce their It is, Your Honor. If you go to various cases that were cited in some of the FCC's earlier briefs, which Phones for All attached to its reply brief, in the investment leasing case and the order adopting Rule 1.103 of the FCC's rules, the commission made a distinction between the effective date of the order, that is, the date on which parties can actually rely on the commission decision and go forward. For example, if they're waiting for approval of a merger transaction. If the commission holds a vote to approve the transaction, parties are free to act on that, rely on that vote and take further action to conclude the transaction. They don't have to wait for the commission to issue a written decision. Now, there is a separate question of public notice. Public notice means when the commission releases the decision, that starts the time for seeking either agency reconsideration or judicial review. They're two separate dates. They have two separate purposes. In some ways, similar to Judge Schroeder, to the analogy you made to the commission or to the court, rather, issuing an order first and a written decision later. And I think it's important also to note that the commission only took one extra day after it voted here. So there's these parade of horribles that Mr. Hazard describes about, well, the commission might take forever. The court has got to assume as a general matter that the commission is going to act in good faith, and it certainly did here. It did what it could to get the order out as quickly as it could, and it only took one day after the deadline announced by the Bureau. I would like to reserve three minutes for my supporting interviewer, Mr. Angstreich. So if there are any further questions, I don't know. I'm not sure that I have anything more to say. Well, I think the important point I wanted to emphasize is that the statute itself does not specify that the commission issue a written order. And as we pointed out in our briefing, there are some other FCC Communications Act provisions in Section 204 and 208 where Congress actually specifies that the FCC must issue an order, uses the phrase, issue an order within a certain specified statutory timeframe. If Congress wanted the commission to issue a written order within the timeframe, we believe it would have said so specifically in Section 10. Do you think Congress felt it had to say that? I mean, common sense would say to me if it says you have to make a decision, that means a written decision. Well, not necessarily, Your Honor. It doesn't have to explain its decision in writing. And that is a separate sentence of the statute. It's in the same section. It is in the same section. And in that very same sentence, it says the commission shall grant or deny, may grant or deny in full or in part, and shall explain its decision in writing. Our point is the decision to deny is separate. The vote to deny is separate from the writing. That's a strained interpretation. I think it's a reasonable interpretation, Your Honor. We shall see. And frankly, I think they don't have standing anyway. And the case may well be moved, as you suggested. Frankly, I don't know. Okay. I don't know what's going to happen to phones for all. I'm not sure that they know what's going to happen to phones for all. Okay. Thank you. Thank you, Your Honor. Thank you, Your Honor. Scott Ainscott is here for Interveners AT&T and Verizon. I'd just in my remaining time like to make a couple of very brief points. First, Congress enacted the statute against the background where it was quite common for the commission to vote on one day and release its order on another day. Had Congress wanted the commission to deviate from that practice, it would have been very easy for it to have said so in the statute. And the commission does, as Mr. Carvin said often, set an effective date of its action. And here it did take a binding vote unanimously to deny this petition and it adopted a specific order. So is your position that if the, in light of the environment in which the statute was enacted, if they had been late by more than a day, it would have been deemed granted? No, Your Honor. I think in light of the environment in which the statute was enacted, deny is reasonably understood to mean taking a vote by a majority to adopt an order. And that's where the Sprint Nextel case comes in. The Sprint Nextel case, the entire fight was, is a 2-2 vote sufficient to be a vote to deny? Now, if you had to both deny and issue an order in order for the deemed grant not to occur, and I argued that case for Verizon, well, who cares whether the 2-2 vote is a denial because there plainly wasn't an order. Was it, is, what is your, in your view, what is the outside limit for the written order to be finalized within the statute? I don't think the statute specifies when the final order has to come out. I think the commission has as a regular practice. This year, all of its forbearance orders were released on or before the deadline. In some cases, it has been delayed pure by a day. I'm aware of no case of an extremely long delay. How do you think of that? I think if they waited more than 30 days, you'd have a good mandamus argument to get the order released. I don't think it'd be particularly reasonable. But I don't think that would make a deemed grant occur. The petition still would have been denied. I mean, there are some logical sort of nuttiness that occurs on Farnsproul's interpretation. Let's say instead of unanimously denying the petition, it was unanimously granted. But then the order came out the day after. Well, we still don't have, right, the order is still late. Now the commission action, according to Farnsproul, didn't occur in a statutory period. It means the order's a nullity. It's an interesting piece of paper, but it's meaningless. And Sprint Nextel tells us that deemed grants can't be reviewed. So you create a situation in which even a vote to grant would suddenly become unreviewable if the order didn't come out. I don't think that quite works. But what's your position with respect to exhaustion? With respect to exhaustion, I think it's clear that this is no different from Quest. Farnsproul had every opportunity to raise an argument, but they didn't. What they did was, and this is at page 103 of the excerpts of record, at the conclusion, the very last paragraph of a pleading addressing the Bureau's extension order, they asserted as that Section 10 requires the order to come out. No arguments. And then in another pleading, and this is a supplemental excerpt at 7, they said the commission should issue some sort of papers. They didn't even say the commission should do it in the order on the petition. They didn't tell the commission how to come out. None of the argument, there are any of a number of arguments that a party might raise. They could argue the statute's unambiguous. They could argue commission precedent requires it. They could argue particular court precedents. And the agency has an obligation to respond to arguments raised. They don't have an obligation to invent arguments for a party. Farnsproul had every opportunity either before the deadline or after it to raise actual arguments to the commissioners. Those commissioners would have given an answer. But what we have now. Maybe. I apologize. Maybe. The commissioners have an obligation to respond to arguments. If they fail to respond to meaningful arguments presented on the administrative record, Farnsproul would have had an argument under the Administrative Procedures Act. Did they say anything? Was there any response to this point at all? I don't think the point was raised in such a way as to warrant a response, a single assertion in the conclusion of a pleading addressing something else and a request for some sort of papers. Would the commission have had an obligation to respond? The commission does. Under the Administrative Procedures Act, the administrative agencies do have an obligation to respond to meaningful arguments made on the record that are germane to the topic of the case. If the commission had an argument in front of it that said, if my order doesn't come out in a certain time period, it's deemed granted, that strikes me as a meaningful argument. Right. But we don't know. We don't know. But we do know, Your Honor, because the agency always. Can I finish my point? I apologize. We don't know if the commission would have deemed that to be a meaningful argument. That's all speculation. I don't think it is, Your Honor, because when Falserall did raise actual arguments about whether the Bureau's extension order was sufficient to extend the deadline and prevent the petition from being deemed granted, they did respond to it at length in what, for the FCC, is a quite lengthy footnote, addressing the very arguments and in a couple of paragraphs explaining why those arguments were incorrect. And the agency is entitled to a presumption by the act. If I can get two seconds on the contracts, Your Honor, just because I do think it's important, given that Mr. Hadgen seems to think my clients are going to be on the hook for a lot of money. We cite the contract provisions in our brief and we attach them. The contracts are very clear that once the law changes, and even with forbearance, the law would still be that there is no affirmative obligation on my clients to provide these things, that they can stop providing them. In Verizon's agreement, it's within six months. And in AT&T's, it's upon the Board of Agents. But with the forbearance, it would have been a lot less clear, though. I mean, there would have been an argument that the law was still in effect.  I don't think there would have been. Well, we don't know that. But I think we do, because the Supreme Court and the defense have both held that there is no unbinding absent a commission order requiring it. Thank you, Your Honor. Your Honor, I'll do my best to kind of go towards the arguments of opposing counsel here. Mr. Angstreich made much of the fact that the Supreme Court was – I'm sorry, that the Congress was aware that the FCC routinely made a decision one day that and then released decisions a different day. There's no evidence of that in the statutory – in the legislative history. And I think what we know from Supreme Court precedent that, you know, agencies conjecture that Congress intended to endorse its practices by failing to expressly reject them is not an appropriate basis for determining congressional intent. And that's Rapanos v. United States, 126, Supreme Court 2208. Back to the notion about the timeliness and the backdating and whatnot. Here's what Judge Garland in the D.C. Circuit said. Waiting until the 11th hour to vote on a forbearance petition and then waiting until the 13th hour to issue an explanatory order is hardly an ideal procedure for notifying a party of the disposition of a petition. And relying on an informal press release and a backdating regulation to satisfy a commission policy is at risk of judicial invalidation. Now, Judge Garland's a very reasonable man, and that was a pretty square shot across the bow. I really do understand your position there, but I'm still having trouble. We are a court that reviews what the agency does. Yes. And if you don't give the agency an opportunity to explain why it's doing this, it's very difficult for us to review it and simply say, well, you've got to be right and the agency's got to be wrong. So I'm having — I'm just having a little problem with that. I just — No, I — If you have — And I understand that. And I would point the Court to — I just had it. The Ninth Circuit cases basically say if the agency has done something multiple times, its view is known, and you could go ahead and evaluate it. Moreover — So are you saying there was — that exhaustion would have been futile? Is that your argument? Yes. The futility exception is recognized by the Ninth Circuit, Your Honor. Thank you. And then, moreover, what we have here is really a pure legal issue. And this Court has recognized — But where is the explanation that you want us to review, that you don't have to do it because it's — Well, I think what the Court has to review is whether the order on its face satisfied Section 160C. Did it — was the vote sufficient to prevent deemed granted from occurring? I think the opposing counsel said that it was known that this was the practice of the agency because the legislation was made in light of that backdrop. So I — And then, Mr. Carr, for the FCC, someone said that that is the agency's practice, so there's no question about what the practice is. And I would just make one more point about Mr. Angstreich's comment on Sprint and Excel. An important point there to remember is the posture of that case. Sprint and Excel felt very wronged by Chairman Martin letting that become deemed granted. So what it tried to do was seek review of a press release, seek review of a vote, and seek review of the separate statements of two of the dissenting commissioners. What the D.C. Circuit found was that it could not review those items. So let me ask you this on the contracts. What's your response to the argument that forbearance would not have made a difference because the providers would not be obligated at that point to give those rates? We just have a different view of the contracts. And in our view, that those contracts would have continued them, AT&T and Verizon, to provide the service, the environmental network element platform service, until they were amended. And that's something we have to fight out later. And we're willing to take that on. But we, you know, for purposes of here, we just have a different view of what those agreements are about. Well, why on the merits was the FCC wrong? That's what I'm not understanding. We are reviewing what the agency said. On the merits of the forbearance analysis? Yeah. Didn't they say, well, you've already had this. This isn't going to give you what you want. You've already had the opportunity to challenge what would have given you what you want, and you lost. Well, first, the conclusion that it wouldn't have given us what we want is incorrect. We never asked them to – well, see, what the FCC said is, look, you're not really asking for forbearance from anything. What you're asking us to do is modify our national unbundling rule. And, no, we didn't ask them to do that. We asked them to do a Section 10 analysis to find if forbearing from this rule in a very narrow and limited way was consistent with Section 160A1, 160A2, and 160A3. And they didn't do that analysis. One of the cases we relied on, Track Phone, was all about universal service and expanding service offerings. We made those exact same arguments, and they were for naught. Let me just make one other point. If they are right that if we go down this battle on the contracts and we lose, then there's no risk to anybody for holding the FCC to Congress's deadline. Now, I'm very confident that if we get the opportunity, we will prevail. But the Court does not need to be scared of some big, horrible event happening by making the FCC know that Congress means what it says and that you have to follow the congressionally set deadline. So I ask that you vacate the order. Thank you. Thank you, Your Honor. The case just argued is submitted for decision. Can we move forward? All right. We'll hear the next case, which is Palm Desert National Bank versus the Federal Insurance Company.
judges: Schroeder, Rawlinson, Sandoval